# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **STELLA OMOJOLA,** | **Case No. 19–cv–20354–ESK–SAK** |
| **Plaintiff,** |  |
| v. |  |
| **ARC OF OCEAN COUNTY, *et al.*,** | **OPINION** |
| **Defendants.** |  |

**KIEL, U.S.D.J.**

    **THIS MATTER** is before the Court on defendants Arc of Ocean County, Laura Williams, Jill Herbst, Nancy Cadigan, and Andrea Pizzulo's motion for summary judgment.   (ECF No. 124.)[1]   For the following reasons, defendants' motion will be GRANTED IN PART AND DENIED IN PART.

---

[1] Defendants fail to seek summary judgment on all claims, omitting from their brief any argument as to Counts 11 and 12 of the amended complaint.   Counts 11 and 12 allege violation of the New Jersey Conscientious Employee Protection Act (NJCEPA).   (ECF No. 4 (Am. Compl.) pp. 51–56.)   The omission seems to have been caused by defendants looking to the original, rather than the operative amended complaint.   Defendants seek summary judgment as to Counts 11 and 12, but identify them as claims of negligent hiring and negligent retention (ECF No. 124–4 (Defs.' Mot. Br.) p. 52 n. 5), as they appeared in the original complaint (ECF No. 1 pp. 49–52). Defendants also identify plaintiff's Title VII and New Jersey Law Against Discrimination (NJLAD) claims as ordered and described in the original complaint. (Defs.' Mot. Br. p. 37 n. 1.)   Defendants were otherwise aware of plaintiff's NJCEPA claims as evidenced by their answer to the amended complaint (ECF No. 8) and inclusion of the amended complaint with their exhibits (ECF No. 124–6 (Defs.' Exs.) pp. 66–136).   Plaintiff does not address this issue in her opposition brief.   Though the parties' briefing includes discussions of Title VII and NJLAD retaliation, the NJCEPA is distinct.   *See Skoorka v. Kean Univ.*, Case No. 16–03842, 2018 WL 3122331, at *10 (D.N.J. June 26, 2018).   Summary judgment will not be entered as to Counts 11 and 12 of the amended complaint and plaintiff's NJCEPA claims will be permitted to proceed.   *See Cruz v. New Jersey*, Case No. 16–00703, 2022 WL 3681243, at *9–10 (D.N.J. Aug. 25, 2022) (declining to grant summary judgment on the plaintiff's Title VII retaliation claim because the defendants did not address it in their moving brief and it was distinct from the NJCEPA claim that was addressed).

## I.    BACKGROUND

Arc serves adults and children with intellectual and developmental disabilities.    (Defs.' Exs. p.207.)    Plaintiff Stella Omojola began work at Arc in October 2013 with the title of assistant director – residential services.    (ECF No. 127–2.)    In that role, plaintiff was in charge of four homes, including their staff and finances.    (ECF No. 127–3 (Pl.'s Dep. Tr.) p.39:1–8.)[2]

On August 14, 2018, plaintiff was terminated.    (ECF No. 127–33 (Aug. 14, 2018 Termination Email).)    The propriety of her termination—and the alleged discrimination and harassment based on her race, national origin, and religion that she faced during her tenure—serve as the basis for plaintiff's claims.    The parties' statements of material facts jump from one incident or practice to another, culminating in plaintiff's termination.    For ease, I adopt a similar convention and will seek to group the purported incidents below before moving on to the analysis.

### A.    Plaintiff's Interactions with Staff

Plaintiff had several incidents with staff, with plaintiff believing that she was undermined and belittled by management.    (Pl.'s Dep. Tr. pp.6:23–7:13.) For instance, on November 21, 2013, Nicole Spadafora, a subordinate of plaintiff's, wrote to Herbst, director of human resources, that plaintiff told her to "look to God for [her] judgment."    (Defs.' Exs. p.394.)    Spadafora wrote that she did not share plaintiff's beliefs, that hearing about plaintiff's ministry and

_____

[2] Plaintiff's exhibits include portions of depositions that skip from page to page as necessary.    For consistency, and per my usual convention, I will cite to these transcripts by exhibit page rather than their page in the original, full transcripts.    It is also my general convention to provide a title for exhibits cited multiple times throughout an opinion: the deposition of a particular witness, a letter sent on a specific date, and so on.    Defendants submit a single, 949–page exhibit that in some cases includes portions of multiple depositions of the same witness.    I find that following my usual convention would be needlessly confusing and refer to defendants' exhibit as a single document.    Future motions and other papers filed by defendants shall include individually filed exhibits.

mission work made her uncomfortable, and that she did not believe that religion was relevant to their work. (*Id.*) A meeting was held between plaintiff, Herbst, and Pizzulo, a residential director, in which Herbst stated that personal beliefs were to be respected but not discussed in the workplace. (*Id.* p. 396.) Plaintiff understood. (*Id.*)

Spadafora sent another email, this time to plaintiff and copying Herbst, on March 6, 2014, in which she stated that she was upset that plaintiff joked that she and a resident should get married and have a child. (*Id.* p. 398.) Plaintiff wrote back, copying Herbst and Pizzulo, apologizing, explaining the joke, and stating that hostility between the two appeared to be returning. (*Id.* p. 400.) She wrote that they could not "continue like this, looking for excuses to get the other person in trouble as a form of getting back to that person, twisting and manipulating, and not telling the truth about issues coupled with blowing matters out of proportion …." (*Id.*)

Plaintiff was issued a written warning by Pizzulo on July 8, 2014 due to her "harsh and negative" email responses to Spadafora and directed to submit agendas in advance of weekly meetings with Spadafora. (*Id.* p. 402.) Plaintiff was issued another written warning by Pizzulo on August 6, 2014 for emailing Spadafora after she was instructed not to do so. (*Id.* p. 404.) Plaintiff apologized and explained that she misunderstood the instruction. (*Id.*) Spadafora was made aware of reprimands plaintiff received. (Pl.'s Dep. Tr. pp. 63:24–64:11.) A fellow assistant director, Valerie Poku, attests that Spadafora was hostile toward plaintiff and plaintiff was upset that supervisors would blame her whenever Spadafora "lodged yet another frivolous complaint." (ECF No. 127–5 (Poku Certification) pp. 3, 4.)

In another incident, in June 2018, a staff member requested time off to spend with her terminally ill brother. (ECF No. 127–6 p. 3.) Plaintiff responded with condolences, leave information, and that "God can do all

things." (*Id.*)  Herbst responded that, while plaintiff was trying to make the employee feel better, she was "asking [her] again to please be mindful of [her] references to God, prayer, or any other religious connotations in [her] professional communication." (*Id.* p.2.)  Plaintiff emailed back acknowledging Herbst's instruction and adding "that sometimes [she] forget[s] that a lot of people these days are intolerant towards Christian faith."  (*Id.*)

Plaintiff testified that individuals would play music in the office, but she was asked to keep her music to herself and offered an earphone because she played Christian music.  (Defs.' Exs. pp.421:22–422:19.)  Poku testified that playing music was allowed in the office, but headphones were preferred.  (*Id.* p.448:14–17.)  Plaintiff was asked to turn her music down or use headphones because it could be heard when a colleague was meeting with someone or on the phone.  (*Id.* p.449:3–23.)  On July 2, 2018, Herbst sent an email to staff with "a few reminders about Office Etiquette" including "[i]f you want to listen to music use headphones."  (*Id.* p.454.)

Finally, on May 10, 2016, plaintiff answered a call from Joan Ottolaine, a substitute employee seeking hours.  (ECF No. 127–8 pp.4, 5.)  When plaintiff answered, Ottolaine purportedly asked "[c]an I speak to an American …. Is there no American there?  Give the phone to an American …." before hanging up.  (*Id.*)  Ottolaine was prohibited from working until meeting with human resources.  (*Id.* pp.3, 4.)  Ottolaine stated that she was unavailable to timely meet with Herbst and ultimately resigned.  (*Id.* p.2; ECF No. 124–7 (Herbst Certification) p.1.)

### B.  Plaintiff's Work Hours

Plaintiff's role required her to be on-call one weekend per month, a responsibility that rotated among assistant directors.  (Defs.' Exs. pp.427:24–428:7.)  During her time at Arc, plaintiff participated in an annual women's retreat.  (*Id.* pp.426:23–427:9.)  Williams, Arc's executive director, was aware

that plaintiff served as a pastor but plaintiff did not think it necessary to provide a schedule because she was off on Sundays and never had to go into work during church hours. (*Id.* pp. 427:10–23, 428:19–21.) Williams was aware of plaintiff's annual retreat, but testified that additional planning to accommodate was unnecessary as assistant directors were expected to sort on-call schedules out among themselves. (*Id.* p. 326:14–23.) Plaintiff testified that, rather than covering shifts, shifts were left for her to cover as part of a "set up." (Pl.'s Dep. Tr. pp. 48:11–49:1.)

Assistant directors also worked flex hours. (Defs.' Exs. p. 312.) Williams testified that flex hours were intended to provide assistant directors with the autonomy to manage their own workweek to meet their personal needs and needs of their programs. (*Id.* pp. 328:23–329:4.) Arc had issues with assistant directors working longer hours early in the week and leaving early on Fridays and supervisors wanted employees to plan schedules in advance and seek approval for atypical scheduling. (*Id.* p. 329:5–19.) Poku testified that permission was required for use of flex time and flex time included leaving early one day after working more than typical hours during another. (*Id.* p. 446:5–10.)

On April 19, 2018, Pizzulo wrote to plaintiff stating that plaintiff left at 4 p.m. on a Friday and that if she was flexing more than an hour of time she needed approval. (ECF No. 127–7 (Apr. 19, 2018 Flex Time Email).) Plaintiff testified that she was "witch hunt[ed]" by Pizzulo and not permitted to use flex time. (Pl.'s Dep. Tr. pp. 24:24–25:10.) Plaintiff further testified that she had difficulty flexing time for a doctor's appointment and was chastised for visiting a home on her way from her appointment. (*Id.* pp. 17:9–19:23.) Plaintiff was the only employee Poku was aware of who was denied flex time, while another employee—Greg Sharkey—was known to manipulate his hours. (Defs.' Exs.

5

pp. 446:19–21, 447:6–8.)  Poku infrequently used flex time, but was accommodated by Pizzulo.  (*Id.* pp. 446:22–447:5.)

Plaintiff also attests that she wished to participate in a program in which assistant directors could earn extra money by working direct-care roles and updated her certifications to do so.  (ECF No. 125–47 p. 2.)[3]  She claims that her requests were ignored until she stopped asking.  (*Id.* pp. 2, 3.)  Herbst states that plaintiff never asked to work additional hours.  (Herbst Certification p. 2.)

### C.    Plaintiff's Role in Hiring and Firing

There were often staff shortages at Arc.  (Defs.' Exs. p. 520:2–13; ECF No. 126–1 p. 205:3–13; ECF No. 127–17 (Yurkanin Dep. Tr., May 17, 2022) p. 19:2–7.)  Arc adopted a practice by which if an employee recommended someone and the recommended person worked a certain number of hours, the referring employee would receive $500. (Pl.'s Dep. Tr. p. 38:15–17.)  Three individuals—Gabriel Awolola, Victor Akinlolu, and Tolu Ekisola—applied to Arc at plaintiff's suggestion.  (ECF No. 127–9 (Awolola Certification); ECF No. 127–10 (Akinlolu Certification); ECF No. 127–36 (Ekisola Certification).)  Awolola and Akinlolu both mentioned plaintiff's reference and were not hired. (Awolola Certification; Akinlolu Certification.)  Ekisola did not mention plaintiff and was hired.  (Ekisola Certification.)  Ekisola testified that he applied to Arc at a job fair and did not mention plaintiff because he did not know that she worked at Arc at the time.  (Defs.' Exs. p. 546:2–13.)[4]  Plaintiff advised those who she recommended not to mention her because she believed

_____

[3] Plaintiff's certification does not indicate that it was made under penalty of perjury.  *See* 28 U.S.C. § 1746.

[4] Ekisola's testimony that he did not know that plaintiff worked at Arc at the time of his application contradicts, or is contradicted by, his affidavit stating that he knew plaintiff was an assistant director and plaintiff encouraged him to apply. (Ekisola Certification.)

that management did not like her and were discriminating against her.   (Pl.'s Dep. Tr. pp. 37:4–38:23.)

At some point, a manager was hired for one of plaintiff's homes without plaintiff's inclusion in the interview process.   (Defs.' Exs. pp. 457:11–458:25.) Plaintiff testified that this undermined her and she was not given the opportunity to determine whether the hire would be a good fit.   (*Id.* pp. 457:11–458:5.)   Plaintiff raised a potential conflict with the new manager because he had attended her church.   (ECF No. 127–11.)   Plaintiff further stated that the new manager would not have been hired if she was involved in the interview because of her knowledge of his work history—but she did not provide specifics. (Defs.' Exs. pp. 479–80.)   Plaintiff was offered the opportunity to become the assistant director of other homes so that she would not have to supervise the new manager.   (*Id.* p. 483.)

Separately, a manager of one of plaintiff's homes was terminated without her involvement.   (Pl.'s Dep. Tr. pp. 9:25–10:13.)   The terminated manager was at a restaurant with a client when the client fell and the terminated manager took the client back to programming rather than for medical treatment.   (Defs.' Exs. pp. 338:21–339:11.)   When the client was eventually hospitalized, plaintiff was sent to the hospital as assistant director of the client's home.   (*Id.* pp. 339:24–340:21.)   The manager was terminated while plaintiff was still at the hospital.   (*Id.* p. 341:9–15, 572, 573.)   In addition to terminating the manager without plaintiff's involvement, Pizzulo met with the home's staff without plaintiff.   (Pl.'s Dep. Tr. p. 10:7–10.)

The terminated manager would typically prepare home financials and present them to plaintiff for review.   (Defs.' Exs. p. 466:9–14.)   After the manager was terminated, Pizzulo took the home's financial binders.   (*Id.* pp. 337:14–338:20; Pl.'s Dep. Tr. pp. 58:22–59:6)   The assistant manager assumed the lead on financials and plaintiff did not review them, believing that

Pizzulo was reviewing them. (Defs.' Exs. p. 467:1–15.) On July 7, 2018, the assistant manager wrote to plaintiff and Pizzulo that money was missing from the home. (*Id.* p. 603.) A subsequent review resulted in plaintiff and the assistant manager each receiving a 90–day review period while Pizzulo was given a written warning. (*Id.* pp. 605–07.)

### D. Client Incident, Investigation, and Plaintiff's Response

On July 27, 2018, a resident of the Burrsville group home reported to Cadigan that plaintiff asked her to wake up and shower a fellow resident. (*Id.* p. 613.) Another resident reported that she helped plaintiff with placing a diaper on the fellow resident. (*Id.*) A subsequent report, issued on August 6, 2018, concluded that plaintiff did not instruct the residents to assist with any care, it was "concerning that [the] resident … asked to assist with the morning routine of another resident and that [plaintiff] was unable to provide a clear no," and that it was of further concern that there was not proper communication during a shift change and that plaintiff failed to document any unusual occurrences. (*Id.* p. 614.)

Prior to the completion of the investigation, on July 30, 2018, plaintiff emailed Cadigan and Herbst stating that "it [wa]s obvious to [her] that Arc [was] building up paper trail to terminate [her] employment, for reasons which [she] suspect[ed were] religious and race-based." (*Id.* p. 707.) Plaintiff stated that she was being "edged-out" of responsibilities, such as finances, and asserted that she never asked the resident to help her. (*Id.*) Plaintiff wrote that it seemed as though Cadigan and Herbst were "constantly looking for things to accuse" her of and that such efforts were motivated by discrimination. (*Id.*)

Plaintiff responded to the investigation in an August 6, 2018 letter in which she copied a coordinator at the New Jersey Department of Developmental

Disability. (*Id.* pp. 619–23.) Plaintiff wrote that Arc had opened too many homes and had insufficient staffing, reducing the quality of care provided to clients. (*Id.* p. 619.) Burrsville exemplified the lack of staffing, according to plaintiff, and she explained that the investigation resulted from a situation in which she was alone on a morning shift and overwhelmed. (*Id.* pp. 620–22.) Plaintiff stated that she believed that she was being discriminated against on account of her race and religion and was being used "as an individual scapegoat, to feign a documented pattern of investigations and disciplinary actions, to pose a veil of due diligence." (*Id.* p. 622.) Plaintiff further asserted that Arc was taking advantage of the status of the Burrsville home to build a record with which she could be terminated. (*Id.*)

Plaintiff's letter did not result in an investigation by the Department of Developmental Disability. (*Id.* p. 523:17–19.) In an August 7, 2018 memo, Williams wrote that Arc took plaintiff's allegations of discrimination seriously and encouraged plaintiff to provide examples of discrimination. (*Id.* pp. 632, 633.) Williams and plaintiff met on August 8, 2018, during which Williams said that she did not intend to terminate plaintiff. (*Id.* p. 635.) In the follow-up email, Williams further acknowledged four areas of concern raised by plaintiff—including music played at work and Herbst's instruction as to religious sentiments in the workplace—and sought to confirm whether those issues encompassed plaintiff's concerns. (*Id.*) Plaintiff responded that same day, stating that she had provided all of the information on discrimination that she intended to provide and that "the ones that occur in the past should be left alone." (*Id.* p. 639.)

Williams wrote to plaintiff on August 14, 2018 following an investigation into plaintiff's allegations of discrimination. (*Id.* pp. 478–81.) The investigation resulted in recommendations such as a reminder to include assistant directors in the interview process and for plaintiff to notify human

resources if a candidate she recommended was not promptly contacted.    (*Id.* pp. 478–80.)    The outcome of the investigation did not otherwise expressly substantiate plaintiff's discrimination claims.    (*Id.*)

## E.    **Plaintiff's Termination**

On August 9, 2018, a fire watch was issued in the Burrsville home following a fire-alarm malfunction and the fire department's inability to reset the alarm.    (ECF No. 127–22 p. 3.)    The fire watch required that the home be inspected every 30 minutes and for the inspection to be logged.    (Yurkanin Dep. Tr., May 17, 2022 p. 11:10–11.)    When a new staff member started their shift, they were to review the "T Log" to learn what occurred during the previous shift and acknowledge that they read it.    (*Id.* p. 15:7–19.)

On August 10, 2018, Williams emailed plaintiff to notify her that the fire-alarm system at Burrsville was not working.    (ECF No. 127–24 (Aug. 10, 2018 Email).)    The email stated that walkthroughs of the interior and exterior of the home were to be conducted every 30 minutes to identify potential issues, the home could not be left unattended, an unsuccessful fire drill had been conducted the previous day, and the fire-evacuation plan was to be revised to require two overnight staff and for one resident to be verbally instructed to evacuate during a fire.    (*Id.*)    Plaintiff was made responsible for securing additional overnight staff.    (*Id.*)    Staff providing direct care were not to be used to help locate additional staff.    (*Id.*; *see also* ECF No. 127–25.)

The assistant manager made the schedules for the Burrsville home. (ECF No. 127–28 (Yurkanin Dep. Tr., July 5, 2022) p. 9:17–20.)    The assistant manager and another staff member were scheduled to work the 3 p.m. to 11 p.m. shift on August 12, 2018.    (ECF No. 127–27 (Burrsville Staff Schedule) p. 2.)    The assistant manager took clients out for dinner on the evening of August 12, 2018. (Yurkanin Dep. Tr., May 17, 2022 p. 32:7–13.)    The assistant manager testified that she would have had to receive the money to

10

take clients out to eat from a superior, but she could not recall who gave her the money.  (Yurkanin Dep. Tr., July 5, 2022 pp. 12:8–13, 14:8–15.)  She also testified that she did not recall being reprimanded for leaving the home during the fire watch.  (Yurkanin Dep. Tr., May 17, 2022 pp. 32:18–33:1.)

Plaintiff sent an email to staff, copying Cadigan, on August 13, 2018 stating that the fire watch continued, staff were to be present in the home 24 hours a day to perform rounds every 30 minutes, staff were to record rounds as instructed, and the email was to be printed out and placed in the communication binder for all staff and substitutes to be informed.  (ECF No. 127–29 p. 6.)  Two staff members initialed the email.  (*Id.*)  Two staff members, Jen Harmon and Doreen Chapman, were scheduled to work from 10 p.m. and 11 p.m., respectively, on August 13, 2018 to 9 a.m. on August 14, 2018. (ECF No. 127–18 (Harmon Dep. Tr.) pp. 18:24–20:22; Burrsville Staff Schedule p. 3.)  Chapman ultimately left work at 7:01 a.m. on August 14, 2018. (Burrsville ADP Time Rs. p. 6.)  Chapman testified that a staff member came to Burrsville at 7 a.m. while she was leaving but that it was not reflected on time-tracking documents. (ECF No. 127–30 p. 13:3–18.)  The Burrsville vehicle log shows that Harmon took the vehicle out for programming from 8:15 a.m. to 10:15 a.m. on August 14, 2018.  (ECF No. 127–32 (Burrsville Vehicle Log).)  Plaintiff arrived at Burrsville at 8:30 a.m. on August 14, 2018. (Burrsville ADP Time Rs. p. 6.)

Plaintiff was terminated on August 14, 2018.  (Aug. 14, 2018 Termination Email.)  The termination email stated that Burrsville was left unattended on August 12, 2018 between 5:30 p.m. and 8:30 p.m. and again on August 14, 2018 between 8:14 a.m. and 8:30 a.m.  (*Id.*)  Plaintiff's "refusal to secure adequate staff coverage ha[d] posed a risk to the safety and well-being of the individuals of the residence."  (*Id.*)

11

## II.   MOTIONS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure dictate that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A dispute is genuine when "the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party'" and a dispute of fact is "'material' if it 'might affect the outcome of the suit under the governing law.'"   *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   Facts and evidence are to be viewed in the light most favorable to the nonmovant.   *Id.*

Local Civil Rule 56.1 provides that "the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion."   L. Civ. R. 56.1(a).   A court may exercise its discretion in denying a motion that does not comply with Local Civil Rule 56.1.   *See Anise v. JPMorgan Chase Bank*, Case No. 16–08125, 2016 WL 9281267, at *1 (D.N.J. Nov. 29, 2016).   Local Civil Rule 56.1 further requires that the party opposing summary judgment file a responsive statement of material facts responding to each paragraph of the movant's statement, asserting agreement or disagreement, "and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion …."   L. Civ. R. 56.1(a).   Any statement that is not clearly and substantively denied with an appropriate citation to the record is deemed admitted pursuant to Local Civil Rule 56.1.   *See Coastal Jersey Holdings, LLC v. Giordano*, Case No. 22–02024, 2023 WL 7545301, at *5 (D.N.J. Nov. 14, 2023); *see also* Fed. R. Civ. P. 56(e) (stating that—upon a party's failure to properly address an assertion of fact—a court may provide an

opportunity to address that fact, consider the fact undisputed, grant summary judgment if the movant is entitled to it, or issue any other appropriate order).[5]

## III.  DISCUSSION

### A.  Title VII and NJLAD Discrimination (Counts 3, 4, 5, 6, 7, 8, 9, & 10)

#### 1.  Standard

It is unlawful under Title VII for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e–2(a)(1). To state a discrimination claim of disparate treatment, a plaintiff must show that they (1) belong to a protected class, (2) suffered an adverse employment action, and (3) the circumstances surrounding the adverse employment action give rise to an inference of unlawful discrimination. *Brown v. R.R. Grp. LLC*, 350 F. Supp. 3d 300, 303–

---

[5] These provisions apply to the parties' motion practice. For instance, plaintiff's statement of material facts makes characterizations not supported by the exhibits themselves. At other times, she attempts to rebut defendants' statement of material facts without citations to the record. Defendants' response to plaintiff's supplemental statement of material facts also, at times, merely refers the Court to their original statement of material facts rather than portions of the record. Additionally, plaintiff places her response to defendants' statement of material facts and her supplemental statement in her opposition brief and defendants place their response to plaintiff's supplemental statement in their reply brief. (ECF No. 125 (Pl.'s Opp'n Br.) pp. 4–40; ECF No. 126 pp. 2–13.) Defendants include their original statement of material facts in both a separate document (ECF No. 124–3) and as part of their moving brief (Defs.' Mot. Br. pp. 6–35). Statements of material facts are to be placed in a separate document, not part of a brief. L. Civ. R. 56.1(a). I nonetheless accept the parties' briefing and statements of material facts. *See Coastal Jersey Holdings, LLC*, 2023 WL 7545301, at *5. The inclusion of statements of material facts in their briefing ultimately harmed the parties themselves by depriving them of space with which to advance substantive arguments.

04 (D.N.J. 2018).[6]   An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."   *Id.* at 304 (quoting *Barnett v. N.J. Transit Corp.*, 573 F. App'x 239, 243 (3d Cir. 2014)).

Under the burden-shifting framework, once a prima facie claim is established, the burden moves to the employer to provide a legitimate, non-discriminatory reason for its actions, a "relatively light burden."   *Id.* (quoting *In re Trib. Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018)).   If the employer provides such a reason, the burden shifts back one final time for the plaintiff to show that the proffered reason is pretextual and discrimination was the true reason for the adverse employment action.   *Id.*

The NJLAD similarly makes it unlawful for an employer to "because of the race, creed, color, [or] national origin … of any individual … refuse to hire or employ or to bar or to discharge … from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment …."   N.J. Stat. Ann. §10:5–12(a).   Title VII and NJLAD discrimination claims are governed by the same legal framework. *Phillips v. Starbucks Corp.*, 624 F. Supp. 3d 530, 539 n. 3 (D.N.J. 2022).

## 2.   Party Arguments

Defendants assert that plaintiff merely offers vague claims of other employees receiving more favorable treatment than her.   (Defs.' Mot. Br. p. 41.) Plaintiff must do more than argue that other employees deserved to be punished, according to defendants.   (*Id.*)   Defendants argue that plaintiff had performance issues, which are not to be confused with her being discriminated

---

[6] A plaintiff may assert two different theories of religious discrimination under Title VII, disparate treatment and failure to accommodate.   *Miller v. Port Auth. of N.Y. & N.J.*, 351 F. Supp. 3d 762, 777 (D.N.J. 2018).   I read plaintiff's statement of material facts and briefing as asserting a disparate treatment claim.

against.    (*Id.* pp. 41–44.)    For instance, plaintiff was terminated for failure to ensure sufficient coverage at the home after being instructed to do so.    (*Id.* p. 44.)

Plaintiff responds that she is a Black, Christian pastor of Nigerian descent with a long history of good work.    (Pl.'s Opp'n Br. pp. 42–43.)    She likens Arc "to a pyramid, with much racial/ethnic diversity toward the base with the direct care staff working in the group homes, and far less toward the top …."    (*Id.* p. 43.)    Plaintiff faced discrimination including being undermined by management and subsequently nitpicked by subordinates, issued a warning for referencing how God could heal her coworker's brother, instructed to seek approval for flex time, excluded from hiring and termination decisions, unjustly blamed for missing funds, and ultimately terminated.    (*Id.* pp. 43–50.)

### 3.    <u>Analysis</u>

At the outset, I agree with defendants that many of the examples provided by plaintiff do not intuitively constitute adverse employment actions.    For instance, courts in this District have found that reprimands and discipline that do not result in a reduction of pay, reassignment, permanent effect on their employment file, or the like do not constitute adverse employment actions. *See, e.g.*, *Prioli v. Cnty. of Ocean*, Case No. 18–00256, 2021 WL 4473159, at *6 (D.N.J. Sept. 30, 2021); *Hoist v. New Jersey*, Case No. 12–05370, 2015 WL 4773275, at *15 (D.N.J. Aug. 13, 2015).    Plaintiff does little to explain how actions such as reprimands for being held partially responsible for missing funds and conflicts with staff represented "a significant change in employment status."    *See Brown*, 350 F. Supp. 3d at 304 (quoting *Barnett*, 573 F. App'x at 243).

More to the point, even fewer of the alleged discriminatory acts give rise to an inference of unlawful discrimination.    Indeed, plaintiff repeatedly asserts that defendants cannot identify other assistant directors who were similarly

undermined with staff or blamed for missing funds.   (Pl.'s Opp'n Br. pp. 47, 48.) But plaintiff has her burdens crossed.   "The plaintiff bears the initial burden of setting forth sufficient facts to establish a prima facie case for discrimination."  *Spence v. Foxx*, 159 F. Supp. 3d 483, 494 (D.N.J. 2014). Plaintiff has—for many of her claims—failed to identify evidence giving rise to an inference of discrimination such as comparator evidence, similar discrimination toward other employees, or direct evidence of discriminatory statements or actions.  *See Rich v. Verizon N.J. Inc.*, Case No. 16–01895, 2017 WL 6314110, at *24 (D.N.J. Dec. 11, 2017) (concluding that the plaintiff presented insufficient comparator evidence at summary judgment).[7]   The fact that plaintiff belongs to protected classes alone provides just one element of the prima facie analysis.

There are notable exceptions.  Plaintiff draws comparisons between herself and a White, male assistant director—Sharkey—who purportedly was less open about his faith and was not similarly scrutinized about his use of flex time.  (Pl.'s Opp'n Br. pp. 45, 46.)  White assistant directors were also not stripped of financial responsibility despite incidents of financial mishandling. (*Id.* p. 47.)   Comparator evidence refers to evidence of the defendant treating a similarly situated individual outside of the plaintiff's protected class more favorably than the plaintiff.  *Phillips*, 624 F. Supp. 3d at 540.  Similarly

_____

[7] Plaintiff includes as an exhibit to her opposition the certification of Poku, who claims that she was the target of racist attacks such as being "hounded and reprimanded for several frivolous claims …." (Poku Certification p. 3.)  Poku eventually filed an EEOC complaint, after which the attacks subsided.  (*Id.* pp. 3, 5.) Poku asserts that plaintiff was treated differently from White colleagues and subordinates.  (*Id.* p. 4.)   The certification lacks many specifics, but even accepting the Poku certification as evidence inferring discrimination, plaintiff's claims would fail under the burden-shifting analysis as explained *infra*.   *See Chen v. KPMG, LLP*, Case No. 21–01014, 2021 WL 4452062, at *3 n.8 (3d Cir. Sept. 29, 2021) (concluding that even if the plaintiff produced evidence of discrimination against other non-Caucasian employees, there was insufficient evidence to prove that the defendant's proffered explanation was pretextual).

situated does not mean identically situated and whether a comparator is similarly situated is generally a question of fact left for a jury. *Id.* at 542. Relevant factors include "whether the employees dealt with the same supervisor, were subject to the same standards, shared similar job responsibilities and the nature of the misconduct." *Id.* (quoting *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014)).

Plaintiff testified that, while she was required to seek approval before using flex time to leave early, other assistant directors were permitted to use flex time as they pleased. (Pl.'s Dep. Tr. pp. 53:15–54:10.) Poku states that Sharkey was allowed to exercise flex time while Pizzulo was very strict with plaintiff. (Poku Certification p. 4.) Poku adds that White assistant directors were not stripped of handling finances despite incidents of mishandling of funds. (*Id.* p. 5.)

The record indicates that control of financials was taken *prior* to reports of mismanagement, following the termination of a former manager. (ECF No. 127–13; ECF 127–15 pp. 2, 3.) The former manager's termination triggered an audit of financials for the home. (Defs.' Exs. p. 337:14–20.) Plaintiff's allegation as to flex time is supported by an email from Pizzulo in which she stated that plaintiff left at 4 p.m. the previous Friday and that—per past conversations—if plaintiff intended to leave work more than an hour early she was to seek approval. (Apr. 19, 2018 Flex Time Email.) These circumstances do not provide a factfinder with sufficient information to find that the other assistant directors were similarly situated to plaintiff in terms of the nature of their purported behavior. *See Phillips*, 624 F. Supp. 3d at 542; *see also Alcantara v. Aerotek, Inc.*, 765 F. App'x 692, 698 (3d Cir. 2019) (finding that the identified employee was not a comparator as she did not engage in similar conduct as the plaintiff).

17

Even assuming that plaintiff has established a prima facie case, the circumstances identified provide non-discriminatory reasons for the purported adverse actions. This flips the burden back to plaintiff to demonstrate that the reasons proffered by defendants are pretextual. *See Brown*, 350 F. Supp. 3d at 304. A plaintiff may demonstrate pretext at summary judgment two different ways. *Burton v. Teleflex Inc.*, 707 F.3d 417, 430 (3d Cir. 2013). "First, the plaintiff may point to evidence in the record that would cause a reasonable juror to disbelieve the employer's articulated legitimate non-discriminatory reason, thereby creating a genuine dispute of material fact as to the credibility of that reason." *Id.* Second, the plaintiff may identify evidence indicating that the employer acted with discriminatory animus. *Id.* at 430–31.

Plaintiff makes no such effort here. The relevant section of her brief is dedicated entirely to the establishment of a prima facie case. (Pl.'s Opp'n Br. pp. 42–49.) On my own, I am unable to identify evidence that the true reason for taking control of financials and requiring plaintiff to seek permission to use flex time was discrimination.

This conclusion extends to plaintiff's termination. Plaintiff undoubtedly satisfies the first two elements of the prima facie analysis: membership in a protected class and an adverse employment action by way of her termination. However, "[d]emonstrating an adverse employment action … is not sufficient to establish a *prima facie* case …. A *prima facie* case also requires that the adverse employment action be done with discriminatory intent …." *Tourtellotte v. Eli Lilly and Co.*, 636 F. App'x 831, 843 (3d Cir. 2016) (discussing sex discrimination under the NJLAD).

Plaintiff attempts to evidence requisite discriminatory intent with comparator evidence. She asserts that she was not culpable for leaving Burrsville unattended and the staff members who actually left the home unattended were not investigated or disciplined. (Pl.'s Opp'n Br. pp. 48, 49.)

This proposition is supported by the offending manager and assistant manager testifying that they did not recall being investigated for violating the fire watch and opining that plaintiff was unfairly blamed.   (Harmon Dep. Tr. pp. 26:21–27:17; Yurkanin Dep. Tr., July 5, 2022 pp. 22:7–23:12.)   However, "Title VII and NJLAD are not vehicles for challenging employment decisions that are arbitrary, harsh, or even unfair.   A plaintiff cannot defeat summary judgment by showing that an employer's decision to terminate him was mistaken or unwise." *Ewell v. NBA Props., Inc.*, 94 F. Supp. 3d 612, 626 (D.N.J. 2015). The manager and assistant manager are also inapt comparators as they were subordinate to plaintiff and their apparent violations were distinct in scope. *See Norman v. Kmart Corp.*, 485 F. App'x 591, 593 (3d Cir. 2012).

As with plaintiff's pre-termination claims, even if I were to conclude that plaintiff has set forth a prima facie claim, summary judgment would nonetheless be warranted under the burden-shifting framework.   Defendants contend that "[p]laintiff was terminated for failing to insure there was sufficient coverage for a home under her supervision during a Fire Watch after being instructed twice." (Defs.' Mot. Br. p. 44.)   The termination letter stated that plaintiff failed to secure adequate staff and that that failure violated Williams's directive and jeopardized the safety of residents.   (Aug. 14, 2018 Termination Email.)   Plaintiff's termination was preceded by an email from Williams four days earlier informing plaintiff that she was responsible for ensuring that at least one staff member was present at all times and for arranging additional overnight coverage.   (Aug. 10, 2018 Email.)   Plaintiff, principally focused on establishing a prima facie case, fails to rebut this legitimate, nondiscriminatory reason or demonstrate "that discrimination was the real reason for" her

termination.    *See Brown*, 350 F. Supp. 3d at 304.    Summary judgment will be entered in favor of defendants as to plaintiff's discrimination-based claims.[8]

_____

[8] Plaintiff acknowledges that the amended complaint does not formally state a hostile work environment claim, but notes that the alleged hostility of plaintiff's work environment is referenced on numerous occasions.  (Pl.'s Opp'n Br. p. 49.)  Every major actor was White while plaintiff is Black and Nigerian and the record demonstrates that she faced severe and pervasive abuse.  (*Id.* pp. 49, 50.)  Plaintiff claims to have suffered psychological and economic harm and the reputational damage from this litigation and ageism make it difficult for her to find work.  (*Id.* pp. 50, 51.)  Defendants argue that plaintiff's claims spread across years and are not sufficiently severe or pervasive.  (Defs.' Mot. Br. p. 47.)  They add that while an unpleasant work environment is not a good thing, it is also not necessarily actionable.  (*Id.*)  Though the amended complaint fails to set out a count for hostile work environment, I nonetheless consider whether such a claim survives summary judgment.  *See Worthy v. N.J. Dep't of Health*, Case No. 18–17346, 2023 WL 6307467, at *1 n.2 (D.N.J. Sept. 28, 2023) (acknowledging that a separate count was not set out for hostile work environment, but concluding that the allegations provided the defendants with sufficient notice of the plaintiff's intent to assert such a claim).  A Title VII hostile work environment claim requires demonstration that "(1) the employee suffered intentional discrimination because of his race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and, for the employer defendant, (5) the existence of *respondeat superior* liability."  *Brown*, 350 F. Supp. 3d at 304 (quotations omitted).  Title VII and NJLAD hostile work environment claims are "strikingly similar" to one another.  *Nuness v. Simon and Schuster, Inc.*, 325 F. Supp. 3d 535, 545 n.2 (D.N.J. 2018) (quoting *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005)).  My review of the record leads me to reject plaintiff's implied hostile work environment claim for at least two reasons.  First, plaintiff may not sustain a hostile work environment claim "absent evidence that the purported harassment was so severe or pervasive so as to alter the conditions of her employment."  *Leftwich v. Sec'y U.S. Dep't of the Treasury*, 741 F. App'x 879, 882 (3d Cir. 2018).  I am unsatisfied that cited actions such as investigations against plaintiff and failing to hire individuals she recommended are sufficiently severe or pervasive despite plaintiff's bald assertion that "a reasonable person must admit" so.  (Pl.'s Opp'n Br. p. 50.)  Second, like her discrimination claims, plaintiff fails to tether the harassment that she may have suffered to her race, religion, or national origin.  *See Edmond v. Plainfield Bd. of Educ.*, 171 F. Supp. 3d 293, 309 (D.N.J. 2016) ("A legal finding of a hostile work environment under Title VII requires evidence of discrimination *based on membership in a protected class*." (emphasis added)); *see also Richardson v. N.J.- Off. of the Att'y Gen.*, Case No. 16–05711, 2020 WL 13819830, at *7 (D.N.J. Jan. 31, 2020) (concluding that the plaintiff failed to link her supervisor's actions to her race or gender but rather speculated as to the supervisor's motivation).  Ottolaine's "[c]an I speak to an American …" comments represent a notable exception.  But Ottolaine soon resigned after being directed to meet with human resources and

### B.    Title VII and NJLAD Retaliation (Counts 6 & 10)

#### 1.    Standard

A separate analysis is warranted for plaintiff's claims of retaliation under Title VII and the NJLAD.    Title VII prohibits retaliation against an employee for "oppos[ing] any practice made an unlawful employment practice by this subchapter."    42 U.S.C. § 2000e–3(a); *Kengerski v. Harper*, 6 F.4th 531, 536 (3d Cir. 2021).    The NJLAD likewise makes it unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person … filed a complaint …." N.J. Stat. Ann. § 10:5–12(d); *Nuness*, 325 F. Supp. 3d at 561.

The familiar burden-shifting framework applies to retaliation claims made under Title VII and the NJLAD.    *See Phillips*, 624 F. Supp. 3d at 546. A prima facie retaliation claim requires the plaintiff to "show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action."    *Id.*    If a prima facie case is established, the burden moves to the employer to provide a legitimate, non-retaliatory reason.    *Id.*    If such a reason is provided, the plaintiff must be capable of convincing the factfinder that the proffered explanation is false and retaliation is the true reason for the adverse action.    *Id.*

---

plaintiff fails to demonstrate how the incident, though unquestionably offensive, was "so severe and pervasive that a reasonable person in [her] position would believe that the conditions of [her] employment were altered."    *Henson v. U.S. Foodservice, Inc.*, 588 F. App'x 121, 127 (3d Cir. 2014) (referring to racist jokes and comments made during the plaintiff's lunch break).    Summary judgment will be entered in favor of defendants as to any implied hostile work environment claim asserted by plaintiff.

## 2.    **Party Arguments**

Defendants contend that plaintiff has not identified an adverse employment action other than her termination. (Defs.' Mot. Br. p. 48.) Plaintiff was terminated due to her failure to perform her job, according to defendants. (*Id.*) Plaintiff responds that following defendants' "bogus" investigation into the resident who reported her for allegedly seeking help with providing care, she refused to sign the outcome report and drafted a reply in which she copied the Department of Developmental Disability. (Pl.'s Opp'n Br. p. 52.) Eight days later, she was terminated based on a false claim that she left Burrsville unattended. (*Id.*) The temporal proximity between her August 6, 2018 letter and August 14, 2018 termination demonstrates that her termination was about whistleblowing rather than job performance, according to plaintiff. (*Id.* pp. 52, 53.)

## 3.    **Analysis.**

Protected activity includes both formal charges of discrimination as well as informal protests such as complaints to management. *Merke v. Lockheed Martin*, 645 F. App'x 120, 124 (3d Cir. 2016). Only complaints relating to discrimination prohibited by Title VII—discrimination based on race, color, religion, sex, or national origin—constitute protected activity. *Qin v. Vertex, Inc.*, 100 F.4th 458, 476 (3d Cir. 2024). Importantly, and differentiating plaintiff's claims of retaliation from her claims of discrimination, "[a] plaintiff alleging retaliation under Title VII is not required to 'prove the merits of the underlying discrimination complaint,' rather she must have acted 'under a good faith, reasonable belief that a violation existed.'" *Edmond*, 171 F. Supp. 3d at 310 (quoting *Moore v. City of Phila.*, 461 F.3d 331, 344 (3d Cir. 2006)); *see also Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) ("The substantive [Title VII] provision seeks to prevent injury to individuals based on

22

who they are, *i.e.*, their status.   The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct.").

Here, plaintiff wrote to Cadigan, Williams, and Herbst—copying the Department of Developmental Disability—on August 6, 2018.   (Defs.' Exs. pp. 619–23.)   Plaintiff wrote that she was being discriminated against based on her race and religion and "[d]ue to racial and religious differences, Arc [wa]s taking advantage of the situation at Burrsville, to seek opportunities to document negative claims against [her], so as to build a record on which to ultimately terminate [her] employment."   (*Id.* p. 622.)   Plaintiff's actions at the very least constitute complaints to management.   *See Merke*, 645 F. App'x at 124.

Next, "acts of retaliation qualify as adverse employment actions if they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"   *Remp v. Alcon Lab'ys, Inc.*, 701 F. App'x 103, 107 (3d Cir. 2017) (quoting *Moore*, 461 F.3d at 341).   Plaintiff's termination was clearly an adverse employment action, *see Maddox v. City of Newark*, 50 F. Supp. 3d 606, 623 (D.N.J. 2014), and defendants do not argue otherwise (Defs.' Mot. Br. p. 48).

Finally, a plaintiff may demonstrate a causal link between the protected activity and adverse employment action in a variety of ways including the employer's inconsistent explanations for taking the adverse action, a pattern of antagonism, and temporal proximity.   *See Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017).   Though a plaintiff must establish but-for causation between their protected activity and the adverse action, temporal proximity "may satisfy the causal link element of a prima facie retaliation claim, at least where the timing is 'unusually suggestive of retaliatory motive.'" *Blakney v. City of Phila.*, 559 F. App'x 183, 185–86 (3d Cir. 2014) (quoting *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000)).   "Where the temporal

23

proximity between the protected activity and the adverse action is unusually suggestive, it is sufficient standing alone to create an inference of causality and defeat summary judgment." *Collins v. Kimberly-Clark Pa., LLC*, 708 F. App'x 48, 54 (3d Cir. 2017) (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)); *see also Nuness v. Simon and Schuster, Inc.*, 221 F. Supp. 3d 596, 606 (D.N.J. 2016) (noting that when temporal proximity is relied on alone to support causation, courts generally require the termination to occur within a few days of the protected activity).   Here, plaintiff was fired eight days after her August 6, 2018 letter to the Department of Developmental Disability and management, sufficient to support a causal connection.   *See Blakney*, 559 F. App'x at 186 (noting that a temporal proximity of more than 10 days requires supplemental evidence of retaliatory motive).

I find that plaintiff has met her burden in establishing a prima facie case. The burden then shifts to defendants to provide a legitimate, non-retaliatory reason.   Defendants argue here that plaintiff's termination was performance related.  (Defs.' Mot. Br. p.48.)   Plaintiff's termination letter stated that Burrsville was left unattended from 5:30 p.m. to 8:30 p.m. on August 12, 2018 and again from 8:14 a.m. to 8:30 a.m. on August 14, 2018.   (Aug. 14, 2018 Termination Email.)   Plaintiff was terminated due to her "refusal to secure adequate staff coverage." (*Id.*)  Such performance issues constitute a legitimate, non-retaliatory reason for plaintiff's termination.   *See Hanzer v. Mentor Network*, 610 F. App'x 121, 124 (3d Cir. 2015).

The burden thus shifts back once more to plaintiff.   Causation differs at the prima facie and pretext stages.   *Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 95 (3d Cir. 2016).   At the prima facie stage, a plaintiff must introduce evidence supporting the inference of a causal link between the protected activity and adverse action.   *Id.* at 95–96.   At the pretext stage "the plaintiff must show that she would not have suffered an adverse employment action 'but for'

24

her protected activity." *Id.* at 96 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

The same temporal proximity identified in the prima facie analysis above remains relevant here. *See Glaesener v. Port Auth. of N.Y. and N.J.*, Case 20–02294, 2023 WL 8272054, at *7 n.6 (D.N.J. Nov. 30, 2023) ("[E]vidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." (quoting *LeBoon*, 503 F.3d at 234 n.10)); *see also Dunston v. Boardwalk 1000, LLC*, Case No. 19–00512, 2020 WL 4208116, at *8 (D.N.J. July 22, 2020) (concluding that a reasonable jury could find that the plaintiff was terminated in retaliation for his race-discrimination complaints, in part, because he was terminated the following day). As plaintiff notes, she was terminated eight days after her letter to management and the Department of Developmental Disability. (Pl.'s Opp'n Br. p.52.)

Evidence of pretext is not limited to temporal proximity. *See Lynn v. Bank of N.Y. Mellon*, Case No. 22–04655, 2025 WL 907898, at *21 (D.N.J. Mar. 25, 2025) (finding temporal proximity sufficient for the prima facie stage to be insufficient to stave off summary judgment at the pretext stage). Pretext may also be shown by presenting "evidence that would permit a reasonable factfinder to doubt the legitimacy of the [defendants'] proffered reason …." *See Paradisis v. Englewood Hosp Med. Ctr.*, 680 F. App'x 131, 139 (3d Cir. 2017). Plaintiff asserts that Williams's explanation that she was terminated for leaving Burrsville unattended was false. (Pl.'s Opp'n Br. pp.52, 53.) Indeed, the Burrsville schedule shows that two staff members were scheduled for the relevant hours during the evening of August 12, 2018 and morning of August 14, 2018. (Burrsville Staff Schedule pp.2, 3.) There is further evidentiary support that the scheduled staff members left Burrsville unattended after being

25

scheduled and on their own volition.    (Yurkanin Dep. Tr., May 17, 2022 32:7–33:20; Burrsville Vehicle Log.)

In total, I conclude that the evidence is such that a reasonable jury could determine that defendants' proffered rationale was false and retaliation was the true reason for plaintiff's termination.    *See Young*, 651 F. App'x at 99. Summary judgment will therefore be denied for Counts 6 and 10 to the extent that they claim retaliatory termination.[9]

### C.    Conspiracy (Counts 1 & 2)

Counts 1 and 2 of the amended complaint allege that defendants conspired to violate plaintiff's rights before and after she became a whistleblower, violating of 42 U.S.C. § 1985.    (Am. Compl. pp. 28–33.)    Defendants argue that plaintiff is required to establish a genuine issue of material fact as to the existence of the unlawful conspiracy.    (Defs.' Mot. Br. p. 50.)    This includes specific evidence of defendants agreeing among themselves to act unlawfully against her.    (*Id*.)    Plaintiff's conspiracy claims are barred by the intra-corporate conspiracy doctrine, according to defendants, because defendants all worked for the same entity and thus do not constitute separate actors for the purpose of forming a conspiracy.    (*Id*. p. 51.)

Section 1985(3) provides a cause of action for when "two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ...." 42 U.S.C. § 1985(3).    A conspiracy claim pursuant to Section 1985 requires (1) a conspiracy involving multiple persons, (2) one or more of the conspirators to perform or cause to be performed an overt act in furtherance of the conspiracy, and (3) the overt act to

---

[9] Insofar as plaintiff's Title VII retaliation claim survives generally, it may not proceed against individual defendants.    "[I]ndividual defendants are not 'employers' subject to liability under Title VII.    Therefore, ... Title VII retaliation claims cannot be asserted against the individual defendants."    *Skoorka*, 2018 WL 3122331, at *10.

injure the plaintiff's person or property or deprive them of any right or privilege of citizenship. *Brumfield v. Atl. City Hous. Auth.*, Case No. 21–16061, 2025 WL 227311, at *11 (D.N.J. Jan. 17, 2025). Section 1985(3) does not provide any substantive rights and the conspiracy must be motivated by animus toward a protected class. *Id.*

Defendants are correct that "the intra-corporate conspiracy doctrine provides that 'an entity cannot conspire with one who acts as its agent.'" *Abadi v. Target Corp.*, Case No. 23–01050, 2023 WL 4045373, at *1 (3d Cir. June 16, 2023) (quoting *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003)). There are exceptions to the doctrine for when a corporate officer operates in a personal—rather than official—capacity and when an independent third party joins the conspiracy. *Id.* Plaintiff has failed to establish any such exceptions. In fact, plaintiff has failed to address defendants' argument at all in her opposition. Therefore, beyond the merits of defendants' argument, I interpret plaintiff's failure to respond as her abandoning her claims in Count 1 and Count 2. *See Monaghan v. Cnty. of Gloucester*, 599 F. Supp. 3d 196, 210 (D.N.J. 2022). Summary judgment will therefore be entered in favor of defendants on these claims.

###     D.     Common Law Claims (Counts 13, 14, 15, 16, 17, 18, & 19)

Counts 13 through 19 of the amended complaint assert common law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, negligent hiring, negligent retention, negligent supervision, vicarious liability, and respondeat superior, respectively. (Am. Compl. pp. 56–69.) Defendants submit that plaintiff's common law claims rely on the same facts as her NJLAD and Title VII claims. (Defs.' Mot. Br. p. 54.) When the same factual allegations support both NJLAD claims and common law claims, the common law claims are preempted, according to defendants. (*Id.* pp. 52, 53.)

Defendants are correct that "the NJLAD preempts common law claims that are (1) based on the same factual predicates and (2) seek the same relief as a plaintiff's NJLAD claim." *See Belfort v. Morgan Props., LLC*, Case No. 16–05207, 2018 WL 3201787, at *10–11 (D.N.J. June 29, 2018) (collecting cases and entering summary judgment against the plaintiff on his claim of intentional infliction of emotional distress). The same factual allegations support plaintiff's common law, Title VII, and NJLAD claims. Unhelpfully, plaintiff again fails to address defendants' argument. This apparent waiver provides a second basis to dispose of plaintiff's claims. *See Monaghan*, 599 F. Supp. 3d at 210. Summary judgment will therefore be entered in favor of defendants for Counts 13 through 19.

### E.    Spoliation (Count 20)

Finally, Count 20 of the amended complaint alleges that defendants spoliated evidence. (Am. Compl. pp. 69, 70.) "Spoliation occurs where: [1] the evidence was in the party's control; [2] the evidence is relevant to the claims or defenses in the case; [3] there has been actual suppression or withholding of evidence; and, [4] the duty to preserve the evidence was reasonably foreseeable to the party." *Thompson v. Bridgeton Bd. of Educ.*, 9 F. Supp. 3d 446, 451–52 (D.N.J. 2014) (alterations in original) (quoting *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012)). Spoliation, if found, may support sanctions such as adverse inferences. *Goins v. Newark Hous. Auth.*, Case No. 15–02195, 2020 WL 1244576, at *10 (D.N.J. Mar. 13, 2020).

Plaintiff provides nothing in her statement of material facts to support a finding that defendants spoliated evidence. She also does not address defendants' spoliation argument in her opposition brief, indicating a desire to abandon the claim. *See Monaghan*, 599 F. Supp. 3d at 210. Summary judgment as to Count 20 will thus be entered in favor of defendants.

28

## IV.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (ECF No. 124) will be GRANTED IN PART AND DENIED IN PART. Specifically, Counts 6 and 10 of the amended complaint will be permitted to proceed to the extent that they allege retaliatory termination.   Counts 11 and 12 of the amended complaint will proceed in full.   Judgment in favor of defendants will be entered as to all other claims.   An appropriate order accompanies this opinion.

   _/s/ Edward S. Kiel_____
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Dated:  November 14, 2025